IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**TIMOTHY A. BRAGG and
VIOLETA C. BRAGG,
Individually and as Parents
and Natural Guardians of
S.E.B., a minor,**

       Plaintiffs,

v.    Case No. 3:09cv382/MCR/EMT

       [Lead Case]

**UNITED STATES OF AMERICA;
TERRALL NEAL MOORE, D.O.;
RANDALL EUGENE SCOTT, P.A.;
and PHYAMERICA GOVERNMENT
SERVICES, INC.,**

       **Defendants.**

_____/

## ORDER

Timothy A. Bragg and Violeta C. Bragg filed suit against the United States of America ("Government"), PhyAmerica Government Services, Inc. ("PhyAmerica"), Terrall Neal Moore, D.O. ("Dr. Moore") and Randall Eugene Scott, Physician's Assistant ("P.A. Scott"), asserting claims arising from the medical diagnosis and treatment of Plaintiffs' daughter, S.E.B., in the Emergency Room ("ER") of the Naval Hospital in Pensacola, Florida ("NH").[1]  (Doc. 1)  The Government is sued for medical negligence based on the

---

[1] Plaintiffs originally filed this as two separate actions, one against the Government under the Federal Tort Claims Act, No. 3:08cv382, and another against PhyAmerica, Dr. Moore and P.A. Scott based on diversity jurisdiction, 28 U.S.C. § 1332(a), alleging medical negligence, vicarious liability, loss of filial consortium and negligent infliction of emotional distress, No. 3:09cv383.  These cases have now been

conduct of its employees pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680 ("FTCA").  Pending before the court is the Government's motion for summary judgment on grounds that Dr. Moore and P.A. Scott were not employees but independent contractors, and thus the Government is not responsible for their conduct under the FTCA (docs. 23, 24).  For the reasons stated below, the Government's motion for summary judgment is GRANTED.

**BACKGROUND**[2]

On November 4, 2007, a minor, S.E.B., was taken to the ER at NH where she received medical treatment from P.A. Scott for a severe headache accompanied by nausea and periods of incoherency.  After conducting blood work on S.E.B., P.A. Scott advised the Plaintiffs that a computed tomography ("CT") scan was not necessary.  P.A. Scott diagnosed S.E.B. with a stomach virus and prescribed Phenergan, an anti-nausea medication.  Dr. Moore signed off on S.E.B.'s medical chart and she was discharged from the ER.  The next day, S.E.B. was transported by ambulance to Sacred Heart Hospital in Pensacola, Florida.  A CT scan was ordered and a large mass with an intracerebral hemorrhage was identified.  An emergency craniotomy was performed that same day.  Since S.E.B.'s craniotomy, she has undergone two additional surgical procedures.  S.E.B. alleges she has suffered permanent injury and permanent cognitive impairment as a result of the negligence of P.A. Scott and Dr. Moore.

The Plaintiffs filed suit against the Government pursuant to the FTCA, alleging medical negligence, loss of filial consortium, and negligent infliction of emotional distress (doc. 1).  The Government moves for summary judgment on all counts,[3] asserting that Dr.

---

consolidated.  (Doc. 6)

[2]   For the limited purposes of this summary judgment proceeding, the Court views "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party," which in this case is the Plaintiffs.  *Martin v. Brevard County Pub. Sch.*, 543 F.3d 1261, 1265 (11th Cir. 2008) (internal quotation marks omitted).  The Court is mindful that "what is considered to be the facts at the summary judgment stage may not turn out to be the actual facts if the case goes to trial."  *Cottrell v. Caldwell*, 85 F.3d 1480, 1486 (11th Cir. 1996).

[3]   Additionally, the Government has moved for summary judgment in its favor on "any allegation of negligent hiring or retention of competent staff that might be read into paragraph 28 of the [P]laintiffs' Complaint."  (Doc. 23)

Moore and P.A. Scott were independent contractors, not government employees, when they worked in the NH ER.  The Government further argues that, because Dr. Moore and P.A. Scott were independent contractors, the Court lacks subject matter jurisdiction over the Plaintiffs' claims against the Government.

A.   The Contract

The Government entered into a contract ("Contract") with PhyAmerica on July 29, 2004, as amended effective January 4, 2007, to "establish, operate and manage Emergency Room services in support of the Naval Hospital, Pensacola, FL, within the confines of the MTF."[3]  (Doc. 24-2, at 1, 16)  During all times relevant to Plaintiffs' Complaint, the Government and PhyAmerica were governed by the Contract, which provided that the services rendered by PhyAmerica "are rendered in the capacity as an independent, non-personal service Contractor … [and] the Contractor[4] shall not in any manner represent or infer that it is an instrumentality or agent of the United States Government."  (*Id.* at 17-18)  It further permitted the Government to "evaluate the quality of both professional and administrative services for purposes of contract inspection and acceptance."  (*Id.* at 17)  However, the Contract also provided that "[t]he Government retains no direct control over the medical services rendered, including, for example, professional judgments, diagnoses, or specific medical treatments.  [PhyAmerica] shall be solely responsible for any and all liability caused by the acts or omissions of its agents or employees."  (*Id.*)

Under the Contract, the Government retained control over certain administrative, procedural and operational activities.  PhyAmerica was required to "adhere to and comply with all applicable MTF, Bureau of Medicine and Surgery, Department of Defense, and other higher authority directives, instructions, and notices as may be in effect during the term of the contract."  (Doc. 24-2, at 36)  PhyAmerica was required to accept that the "Commanding Officer of the MTF maintains administrative and operational responsibility for all activities within the command and may takes [sic] such actions necessary to preserve and maintain the integrity of the command, subject to the limitations prescribed

---

[3]   The Contract refers to a medical treatment facility, such as the NH, as "MTF."  (*See* doc. 24-2, at 25)

[4]   The Contract refers to PhyAmerica as the "Contractor."  (*See id.*, at 21)

by law and U.S. Navy Regulations." (*Id.* at 18)  The "Commanding Officer" is "[t]he individual who has responsibility for the operation of the military treatment facility at which contract services are being performed."[5]  (Doc. 24-2, at 20)  The Commanding Officer was responsible for determining the MTF's operating capacity, equipment needs, and the granting of clinical privileges, among other things.  Overall, "[c]omplete administrative control of the patients remains with the Government.  All records produced in the performance of this contract and all evaluations of patients are the property of, and subject to the exclusive control of, the Government."  (Doc. 24-3, at 31)

PhyAmerica employees were required to "comply with standards of medical practice pursuant to the bylaws, policies, and procedures of the medical staff of the MTF, the regulations of the MTF related to licensure and regulation of healthcare providers and hospitals, and the standards and recommendations of the Joint Commission,[6] as may be in effect from time to time." (Doc. 24-2, at 35)  In addition to complying with certain standards of medical practice, the Contract required PhyAmerica employees, among other things, to adhere to the MTF policies for prescribing drugs, comply with the provisions of the MTF Occupational Health and Safety Program, and comply with all MTF administrative procedures and policies which apply to the ER.  Further, all healthcare practitioners were subject to "the credentials review,[7] professional staff appointment, clinical privileging,[8] and

---

[5] "For purposes of this contract, this is the Commanding Officer, Naval Hospital Cherry Point, NC." (Doc. 24-2, at 20)

[6] The "Joint Commission" is "[a] national organization dedicated to improving the care, safety, and treatment of patients in healthcare facilities; publishers of the Joint Commission Accreditation Manual for Hospitals and the Ambulatory Healthcare Standards Manual." (Doc. 24-2, at 24)

[7] "Credentials" include

> Record[s] of education, clinical experience, medical licenses, professional performance and continuing education that confirms that a healthcare practitioner is professionally competent to exercise the clinical privileges granted. Additionally, it includes evidence of the healthcare provider's physical and mental well-being. The term is also used generically to include the clinical privileges granted.

(Doc. 24-2, at 21)  "Credentials Review" is

> The "[t]he overall process of review and evaluation of healthcare practitioners' professional qualifications and demonstrated current competence for the purpose of granting delineated clinical privileges. Only the Commanding Officer of the Naval Hospital where clinical privileges are

adverse credentials actions/fair hearing/appeals processes of the MTF as specified in the MTF medical staff bylaws, policies and procedure." (Doc. 24-2, at 36; Doc. 24-3, at 1)

As to the provision of medical care, the Contract enumerated certain procedures and protocols for PhyAmerica healthcare practitioners to follow, but expressly provided that they "may deviate from the protocols when clinical judgment dictates." (Doc. 24-3, at 12) In addition to guidelines and protocols, the Contract enumerated certain procedures PhyAmerica healthcare practitioners must follow in providing their contractual services.[9] The physician is responsible for requesting tests, rendering a diagnosis, document it, and providing treatment. On-call specialists could be summoned when appropriate.

In addition to addressing the Government's administrative and operational control over PhyAmerica's protocols, guidelines and procedures, the Contract addressed PhyAmerica's key responsibilities as Contractor. PhyAmerica was required to provide medical malpractice insurance, workers' compensation insurance and general liability insurance for its employees. (Doc. 24-2, at 34) With regard to salary and benefits, PhyAmerica was responsible for "the payment of all wages and salaries, taxes, withholding payments, penalties, fees, fringe benefits, professional liability insurance premiums,

---

requests, or the Navy Surgeon General, can grant clinical privileges. The process involves the verification of credentials and observation of clinical skills, record keeping, ethics, professional decorum, and participation in staff meetings and professional committees. Input from the QAI/RM program is used in the review and evaluation.."

(*Id.*)

[8] "Clinical Privileges" are "[t]hose elements of medical care which define the scope and limits of practice by a healthcare practitioner in a treatment facility." (Doc. 24-2, at 20)

[9] For example, once a patient arrives at the ER, within five minutes he must be seen in triage and categorized as "emergent," "urgent," or "non-urgent." (*See* Doc. 24-3, at 12) After categorizing each patient, the protocols to be followed by the ER correspond with each respective category. For "emergent" patients, they are to be taken directly to the specified area of care to be seen by a physician immediately. (*Id.*, at 13) As to "urgent" patients, they must be seen within one hour. (*Id.*) If an urgent patient belongs to "TRICARE Prime," the physician may refer the patient to the Primary Care Manager ("PCM") located in the NH, but only after the ER Physician personally speaks with the PCM, and the PCM accepts the patient. (*Id.*) As to "non-urgent" patients, they must be seen "as soon as possible." (*Id.*) These patients may also be referred to their PCM is the patient belongs to TRICARE Prime, or if the patient is there solely for routine purposes, the Physician may refer the patient to a TSC. (Doc. 24-3, at 13) However, if the patient has come to the emergency room seeking routine care or preventative care, the ER Physician is required to refer the patient to a PCM. (*Id.*) The Contract goes on to list the next steps for ER physicians to follow beginning with obtaining the patient's pertinent medical history and ending with writing out a formal discharge. (*See id.* at 13-14)

contributions to insurance and pension or other deferred compensation plans … [and] the … pay[ment] all applicable federal, State, and local income taxes ….” (Doc. 24-4, at 4) PhyAmerica was also required not only to train its own employees, but also to "provide periodic training/advice for EMTs, corpsmen, independent duty corpsmen, physicians and nurses who rotate through the ER Department." (Doc. 24-3, at 32)  In addition to training ER personnel, PhyAmerica was required to "provide assistance to the MTF Education and Training Department by periodically providing personnel to present training classes and lectures to MTF personnel."  (*Id.*)  The Contract further stated "[a]ll care provided to the particular patient is the responsibility of the Contractor physician who completes the treatment form.  Liability for that care rests solely with the Contractor." (*Id.*)

B.  <u>The Physicians</u>

Dr. Moore and P.A. Scott provided emergency care to patients at the NH pursuant to the Contract, as well as individual contracts entered into with PhyAmerica.  Dr. Moore was an Osteopathic physician specializing in Emergency Room Medicine while working in the NH.  P.A. Scott was a Physician's Assistant in the NH's ER Department.  During the relevant time period, Dr. Moore and P.A. Scott did not enter into individual contracts with the Government.  Rather, the Government paid PhyAmerica directly for its compliance with the Contract.  PhyAmerica then issued checks to its employees for their services rendered under the Contract.  The Government did not deduct any taxes from the checks issued to PhyAmerica employees nor did it provide any employee benefits to Dr. Moore or P.A. Scott, such as vacation, sick leave, insurance or retirement programs.

According to P.A. Scott, the NH ER department is under the direction of Dr. Hibbert, who works for PhyAmerica but reports to the Navy Executive Committee of the Medical Staff ("ECOMS"), and his clinical responsibilities are subject to oversight by ECOMS.  The ECOMS Chairman is active-duty Navy.   ECOMS promulgates the standards of care and medical bylaws of the NH.  PhyAmerica healthcare practitioners are required to follow the staff policies and procedures set forth by ECOMS, which include matters such as guidelines governing the acceptable use of medicines and criteria to be met for the use of available laboratory and radiology testing.  Dr. Hibbert "answers" to ECOMS regarding the ER's compliance with NH standards and procedures.

Dr. Moore entered into his contract with PhyAmerica in 2007. At that time, Dr. Moore was also under a contract with ApolloMD and maintained hospital privileges at Gulf Breeze Hospital in Gulf Breeze, Florida. During Dr. Moore's one-year contract with PhyAmerica, the only hospital where he exercised his privileges was the NH. According to Dr. Moore's contract with PhyAmerica, he was to "provide professional medical services as an independent contractor." (Doc. 31-1, at 1) Dr. Moore also agreed to supervise physician extenders if required, such as P.A.s and nurse practitioners. Dr. Moore understood "[he] was an independent contractor with PhyAmerica Government Services." (Dr. Moore Dep. 57:3-6) Section 4 of the contract between Dr. Moore and PhyAmerica further provided:

> It is mutually understood and agreed that in the performance of the professional services, duties, and obligations devolving upon [Dr. Moore] through this Agreement, [Dr. Moore] shall at all times be acting and performing as an independent contractor practicing in his profession of medicine, and [PhyAmerica] shall neither have nor exercise any control or direction over the method or manner by which [Dr. Moore] performs his professional services and functions ... [N]either [Dr. Moore], nor any employee of [Dr. Moore], is an agent or employee of [PhyAmerica.] PhyAmerica shall not intervene in any way or manner with the rendition of services by [Dr. Moore], it being understood that the traditional relationship between Physician and patient will be maintained.

(Doc. 31-1, at 1) Pursuant to NH protocol, physicians must sign a chart before it is finalized, and the signing physician must be the physician that was on duty in the ER during the time the patient was seen. Dr. Moore would review patient charts for patients seen by P.A.s but he personally played no role in making sure that the P.A.s in the NH's ER "follow[ed] any sort of policies and procedures." (Moore Depo. at 18:2-7) With regard to patient treatment, no Navy personnel personally told Dr. Moore how to conduct examinations, prescribe medications or prescribe treatments.

P.A. Scott worked part-time in the NH ER. He stated in his deposition testimony that P.A.s work under the day-to-day supervision of a physician, who is responsible for ensuring that the P.A.'s clinical skills are compatible with his or her patients' needs and that the P.A. has obtained the appropriate education and maintains the requisite certifications. Scott

testified that when he reported for work at the NH E.R., he reported to the attending physician working that particular day, and the attending physician in the ER was a PhyAmerica employee. Scott testified that he did not talk to the supervising physician regarding each patient that he evaluated. Scott also testified that P.A.s were required to be "credentialed" through the hospital and accepted by ECOMS but that he was interviewed and hired by PhyAmerica employees. According to Scott, active-duty Navy consultants, or specialists, would "assist us in care" and "make recommendations towards treatment." (Scott's Depo. at 70, 79) He explained, however, that the Navy consultants were called on to make the decision of whether to admit a patient to the hospital or transfer a patient to another facility, and that Navy specialists would be consulted for input as to treatment on a case-by-case basis where specialty care was needed. On those occasions, he would first consult the PhyAmerica supervising physician, and then, if needed, they would consult the Navy specialist and all would collaborate to determine the patient's treatment plan. Scott testified that there were often patients he treated without the need for consulting a specialist.

With regard to the care of Plaintiff S.E.B., P.A. Scott did not report to any active-duty Navy personnel during the course of S.E.B.'s treatment at the NH ER or consult with any physician regarding her treatment. P.A. Scott examined S.E.B., ordered lab work for her, and then discharged her. Dr. Moore did not examine S.E.B., but he reviewed and signed her medical chart as Scott's supervising physician. Scott testified that no specific guidelines governed the decision to order a CT scan, and no treatment protocol governed how to proceed when a patient presents with nausea and vomiting.

## DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, show that no genuine issue of material fact exists and that the party moving is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]he substantive law will identify which facts are material" and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is material if it is a legal element of the claim under

the applicable substantive law which might affect the outcome of the case.  *See id.*

At the summary judgment stage, a court's function is not to weigh the evidence to determine the truth of the matter, but to determine whether a genuine issue of fact exists for trial.  *See Anderson*, 477 U.S. at 249.  A genuine issue exists only if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party.  *See id.*  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment."  *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust Co. v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).  The court must view all the evidence, and all factual inferences reasonably drawn from the evidence, in the light most favorable to the nonmoving party.  *See Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993).  The court is not obliged, however, to deny summary judgment for the moving party when the evidence favoring the nonmoving party is merely colorable or is not significantly probative.  *See Anderson*, 477 U.S. at 249.  A mere scintilla of evidence in support of the nonmoving party's position will not suffice to demonstrate a material issue of genuine fact that precludes summary judgment.  *See Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

B.  <u>Agency Under the FTCA</u>

Sovereign immunity bars suits against the United States absent an express waiver.  *See United States v. Mitchell,* 445 U.S. 535, 538 (1980).  Congress has authorized a limited waiver of the United State's sovereign immunity under the FTCA for

> [I]njury or loss of property … caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1); *see also United States v. Orleans,* 425 U.S. 807, 813 (1976); *Patterson & Wilder Constr. Co. v. United States*, 226 F.3d 1269, 1273 (11th Cir. 2000).  "The alleged tortfeasor's status as an 'employee of the government' is the *sine qua non* of liability under the FTCA."  *Means v. United States,* 176 F.3d 1376, 1379 (11th Cir. 1999) (citing *Sheridan v. United States,* 487 U.S. 392, 400-01 (1988)).  Under the FTCA an

"employee of the government" includes "officers or employees of any federal agency, members of the military or naval forces of the United States . . . and persons acting on behalf of a federal agency in an official capacity." 28 U.S.C. § 2671. "As this definition makes clear, even private individuals who are not on the Government's payroll may be considered employees for purposes of establishing the Government's liability under the statute." *Patterson,* 226 F.3d at 1274. However, the FTCA does not apply to torts committed by an independent contractor. 28 U.S.C. § 2671; *see Orleans*, 425 U.S. at 814-815. Whether an individual is an employee of the United States for purposes of the FTCA is determined by federal law. *Means v. United States*, 176 F.3d 1376, 1379 (11th Cir. 1999) (citing *Logue v. United States,* 412 U.S. 521, 528 (1973)).

The Eleventh Circuit has held that the "threshold test" for determining whether an individual is an employee of the government or an independent contractor is "whether the government supervised the day-to-day activities of the individual who allegedly committed the tortious acts." *Means*, 176 F.3d at 1379. Under this "control test," the court must determine whether the government had *the authority* to control and supervise the day-to-day activities of the alleged tortfeasor during the relevant time, given the nature of the task(s) assigned. *See Patterson*, 226 F.3d at 1274; *see also Bravo v. United States*, 532 F.3d 1154, 1159-60 (11th Cir. 2008) (emphasizing that it is the Government's authority to control that is determinative). Although when contracting for services "the Government may fix specific and precise conditions to implement federal objectives" and to assure compliance with those goals, the law is clear that such "regulations do not convert the acts of entrepreneurs or of state governmental bodies into federal governmental acts." *Orleans*, 425 U.S. at 816; *see also Del Valle v. Sanchez*, 170 F. Supp. 2d 1254, 1264 (S.D. Fla. 2001). The control test "appl[ies] to physician services[10] in the same manner as any other

---

[10] A debate exists among the circuits regarding the application of the control test "for resolving the employee/independent contractor issue in regard to physicians services because, as a matter of medical ethics, a doctor can never relinquish independent professional judgment; consequently, he or she can never be 'controlled' in the application of professional services." *Spitzer v. United States*, No. CV187-072, 1998 WL 363944, at *5 (S.D. Fla. 1988) (citing *Quilico v. Kaplan,* 749 F.2d 480, 484 (7th Cir. 1984); *Lurch v. United States*, 719 F.2d 333 (10th Cir. 1983); *Wood v. Standard Products Co., Inc.*, 671 F.2d 825, 829 (4th Cir. 1982)). The *Spitzer* court found it was "unnecessary to engage in a theoretical debate" regarding this question because direct control was not evident in practice or in the contract in that case. *Spitzer v. United States*, No. CV187-072, 1998 WL 363944, at *5 (S.D. Ga. 1988). The same can be said in this case, and, therefore, the court will not engage in this debate.

service for which the United States contracts."[11]  *Spitzer v. United States*, No. CV187-072, 1988 WL 363944, at *2 (S.D. Ga.1988).

The Contract provides persuasive support for the Government's argument that Dr. Moore and P.A. Scott were not government employees during the relevant time period. *See Cruz v. United States*, 70 F. Supp. 2d 1290, 1293 (S.D. Fla. 1998) ("[T]he contract and the terms in fixing the relationship of the offending party are critical." (Internal marks omitted)). *But see Spitzer*, 1988 WL 363944, at *4 ("Although the terms of the contract are 'critical' to the employee/contractor question, they are not dispositive."). The Contract provides for the establishment, operation and management of the NH's ER. PhyAmerica agreed to provide healthcare practitioners, clinical support staff, auxiliary support staff, and administrative support staff to perform the requirements of the Contract. The Contract requires PhyAmerica to provide appropriate and timely ER services in accordance with the quality of care established by various recognized medical care organizations. Section 1.4 of the Contract sets forth a description of the parties' contractual relationship. First, it plainly provides that the services rendered by PhyAmerica are rendered in the capacity as an independent, non-personal service contractor:

> INDEPENDENT CONTRACTOR. The services rendered by the Contractor are rendered in the capacity as an independent, non-personal service Contractor … [T]he Contractor shall not in any manner represent or infer that it is an instrumentality or agent of the United States Government.

(Doc. 24-2, at 17-18) Section 1.4 also makes clear that the Government does not retain the authority to control the day-to-day conduct of Dr. Moore and P.A. Scott:

> The Government may evaluate the quality of both professional and administrative services for purposes of contract inspection and acceptance. The Government *retains no direct control* over the medical services rendered, including, for example, professional judgments, diagnoses, or specific medical treatments.

(*Id.* (emphasis added).) Additionally, Section 1.4 expressly imputes liability caused by the negligent acts or omissions of PhyAmerica employees onto PhyAmerica:

---

[11]  The Eleventh Circuit applies the control test to varying services for which the government contracts. *See, e.g.*, *Bravo*, 532 F.3d at 1154 (applying control test to physician services contracted for by government); *Patterson*, 226 F.3d at 1269 (applying control test to pilot services contracted for by government); *Means*, 176 F.3d at 1376 (applying control test to government raid involving FBI, county sheriff's deputies and county SWAT team); *Tisdale v. United States*, 62 F.3d 1367 (11th Cir. 1995) (applying control test to real estate brokerage services contracted for by government).

> The Contractor shall be solely responsible for any and all liability caused by the acts or omissions of its agents or employees.

(*Id.*) The Contract provides that PhyAmerica had the responsibility for selection, assignment, training and daily supervision of its employees, and was required to appoint a Medical Director to direct the ER. The Medical Director of the NH ER, Dr. Hibbert, was considered by Dr. Moore and P.A. Scott to be their supervisor. Dr. Moore and P.A. Scott were paid directly by PhyAmerica; they were not on the Government's payroll. Section 13.2.4.3 of the Contract describes the overall independent nature of the Navy ER:

> In developing support staffing levels, the Contractor shall note that Navy ERs operate, to a large extent, independently of other MTF departments. The Contractor shall perform support functions using Contractor staff.

(Doc. 24-4, at 7) Thus, the Contract terms reflect the parties' intent to delegate to PhyAmerica the day-to-day supervisory responsibilities and to relinquish the Government's direct control over the medical services rendered in the ER. Conversely, no Contract term reserves the authority of the Government to control the care provided by PhyAmerica's physicians on a day to day basis.

In addition to the Contract's express terms, other factors that are relevant to the court's application of the control test include: "(1) the payment of salary and insurance premiums; (2) the payment of taxes; (3) the intent of the parties; and (4) whether the government controlled the manner and method in which the doctor conducted his or her activities." *Del Valle v. Sanchez*, 170 F. Supp. 2d 1254, 1265 (S.D. Fla. 2001); *see also Spitzer*, 1988 WL 363944, at *4 ("Summary judgment cannot rest on the terms of the contract alone."). PhyAmerica paid Dr. Moore and P.A. Scott directly for their services. Pursuant to its contractual obligations, PhyAmerica provided Dr. Moore and P.A. Scott with medical malpractice insurance, workers' compensation insurance and general liability insurance, and was responsible for withholding taxes from their paychecks. Dr. Moore and P.A. Scott did not receive any compensation or benefits from the Navy hospital.

Significantly, the record does not reveal any material questions of fact suggesting that the government exercised control in practice. Dr. Moore and P.A. Scott's uncontradicted testimony demonstrates their freedom from governmental control in the

provision of medical services at NH.  While employed by PhyAmerica, Dr. Moore was not subject to the direction of Navy personnel regarding his examination or treatment of patients in the ER.  Dr. Moore did not personally ensure that the P.A.s in the ER followed any particular practice or procedure.  He, a PhyAmerica employee, confirmed the P.A.s' diagnoses and treatment decisions by reviewing and signing off on every medical chart.  P.A. Scott worked under the day-to-day supervision of PhyAmerica physicians, like Dr. Moore.  Although for special care needs or transfer decisions, Scott would consult active-duty Navy specialists, he first consulted the PhyAmerica attending/supervising physician.  Then, on occasions where a specialist was needed, P.A. Scott, the attending PhyAmerica physician and the active-duty Navy specialist would collaborate to determine the patient's treatment options.[12]  Both Dr. Moore and P.A. Scott worked directly under the Medical Director of the ER, Dr. Hibbert, who is employed by PhyAmerica but "answers" to ECOMS regarding the ER's compliance with NH standards and procedures.  The ECOMS chairman is active duty Navy, but there is no evidence that the ECOMS chairman exercised day-to-day supervision of PhyAmerica healthcare providers.

With regard to the care of S.E.B., P.A. Scott made the diagnosis, prescribed the treatment, and discharged S.E.B.  Dr. Moore reviewed and signed off on the medical chart but did not see S.E.B. during her visit to the NH ER.  While P.A. Scott's work was subject to the supervision of physicians, these physicians were employed by PhyAmerica, and not the NH.  Dr. Moore and P.A. Scott were under the general supervision of Dr. Hibbert, a PhyAmerica employee.  There were no guidelines adopted or enforced by the government or the NH with regard to the treatment of patients presented to the ER with nausea and vomiting, and no guidelines adopted or enforced by the government or the NH governing when a P.A. or physician should order a CT scan for a patient.  At no time did P.A. Scott or Dr. Moore consult or receive instructions from any Navy personnel with regard to S.E.B.'s treatment, nor did they follow any particular Navy treatment protocols in treating her.  The undisputed record demonstrates that no Navy personnel directly supervised the work of Dr. Moore or P.A. Scott on a day-to-day basis.  Thus, the court finds that they were not employees of the NH.

---

[12]  There is no evidence that a Navy specialist was consulted in this case.

Plaintiffs argue that Government control is evident because the Navy specialists provided input on treatment and took control of all decisions to admit a patient to the hospital or transfer a patient to another facility. The Contract requires a physician to summon the appropriate on-call Navy specialist "when deemed necessary and [to] continue medical management until the specialist arrives and assumes care." (Section 5.3.1.9) The Contract also provides that referrals and admissions shall be in accordance with NH's instructions. These provisions describe a procedure of handing off control from the ER physician to the Navy physician or hospital when a patient needs to be transferred out of the ER or needs special care. They do not demonstrate a measure of government control over the ER physician's work in the ER, as the Plaintiffs contend. The Contract plainly outlines the independent nature of the ER in general, and these provisions are consistent with that.[13] Furthermore, the collaborative work described by P.A. Scott, which involved consulting active-duty Navy specialists for particular treatment decisions, does not give rise to control sufficient to yield an employer-employee relationship. *See Spitzer*, 1988 WL 363944, at *5 (finding no government employment in a situation where there was testimony regarding a "team" concept at the hospital, in which "input and discussion by all the doctors, military and non-military, was encouraged and received"). Significantly, even if such treatment collaboration could raise a question of fact regarding whether government employment or agency exists, the facts do not support such a finding in this case where it is undisputed that no Navy specialist was consulted.

Plaintiffs further contend that Dr. Hibbert's participation in ECOMS is evidence of the Government's control over Dr. Moore and P.A. Scott because the ECOMS Chairman, to whom Dr. Hibbert reports, is active-duty Navy. The court disagrees. Not only is Dr. Hibbert's role on the ECOMS irrelevant to Dr. Moore and P.A. Scott's treatment of S.E.B., the Government's alleged control over Dr. Hibbert's day-to-day activities is irrelevant to the inquiry before the court.

Plaintiffs rely on *Bravo v. United States,* 532 F.3d 1154 (11th Cir. 2008), *rehearing and rehearing en banc denied by, adhered to by,* 577 F.3d 1324 (11th Cir. 2009),

---

[13]   The Contract requires PhyAmerica to make note of the fact that "Navy ERs operate, to a large extent, independently of other MTF departments" while developing its support staffing levels. (Doc. 24-4, at 7)

*suggestion for rehearing en banc denied by,* 583 F.3d 1297 (11th Cir. 2009), for support, asserting "the Government has retained the same level of authority [as it did in *Bravo*] to control PhyAmerica's day-to-day activities by setting forth specific requirements for almost every aspect of managing an emergency room." (Doc. 31, at 12) The court disagrees. In *Bravo*, the Eleventh Circuit Court of Appeals affirmed the district court's finding that an OB/GYN physician providing medical services to a Navy hospital in Jacksonville, Florida was an employee of the government under the FTCA. *Bravo*, 532 F.3d at 1159-60. In finding the physician to be an employee of the government, the *Bravo* Court relied on two provisions in the parties' contracts. *Id.* at 1160. The first provision was contained in a contract between the government and Humana Healthcare Services ("Humana"), under which Humana was permitted to enter into contracts with government healthcare facilities in order to provide certain medical services. The provision stated:

> [Humana] shall be responsible for monitoring the performance of Resource Sharing personnel [Dr. Kushner] to ensure compliance with the terms and conditions of the Resource Sharing provider agreements. However, this does not preclude Resource Sharing personnel [Dr. Kushner] from complying with directions received from [Navy hospital] professional personnel in the course of patient care activities.

*Id.* (emphasis omitted). The second provision the court relied on was contained in a contract between Humana and the Navy hospital for OB/GYN physician services, which incorporated the contract between Humana and the government. This provision, or "statement of work," provided:

> The contractor OB/GYN [Dr. Kushner] physician activities shall be subject to day-to-day direction by Navy personnel in a manner comparable to the direction over Navy uniformed and civil service personnel engaged in comparable work. The term 'direction' is defined as that process by which the OB/GYN physician receives technical guidance, direction and approval with regard to an element of work or a series of tasks within the requirements of this agreement.

*Id.* The court concluded that the language in the aforementioned provisions made it "clear" that the Navy hospital reserved the right to control the physician in the course of his patient care activities. *Id.*

The Contract in the instant case does not contain a provision similar to the contract clause in *Bravo* that required compliance with directives of Navy hospital personnel during patient treatment and daily supervision of Navy personnel.[14]  *See id.*  In fact, Plaintiffs concede that the Contract contains no such express reservation of control.  (Doc. 31, at 12)  On the contrary, the Contract contains provisions more closely analogous to those discussed in other cases where courts rejected an employee relationship in favor of an independent contractor relationship.  *See Robb v. United States*, 80 F.3d 884, 887 (4th Cir. 1996) (affirming dismissal for lack of subject matter jurisdiction after finding control test unsatisfied where government contractor ran a "stand alone" medical clinic, selected and paid its employees independently, provided medical malpractice insurance and the government did not control physicians' individual medical judgment); *Carrillo v. United States*, 5 F.3d 1302, 1304-1306 (9th Cir. 1993) (affirming grant of summary judgment for government after finding control test unsatisfied because government did not retain control over physician's diagnosis and treatment of patients); *Broussard v. United States*, 989 F.2d 171, 174-76 (5th Cir. 1993) (affirming partial summary judgment for government on finding the control test unsatisfied where the government contractor hired and paid the ER physicians, assumed full liability for the acts or omissions of its employees, agreed to carry liability insurance for its employees and was to provide its services as an independent contractor, and the government retained no control over contractor's professional services).[15]

---

[14]   The Contract in the instant case contained the following provision, which is somewhat similar to the contract between Humana and the government in *Bravo*:

> The Contractor shall adhere to and comply with all applicable MTF, Bureau of Medicine and Surgery, Department of Defense, and other higher authority directives, instructions, and notices as may be in effect during the term of the contract.

(Doc. 24-2, at 35)  However, there is a material distinction between this provision and those deemed dispositive in *Bravo*.  This provision does not require physicians to comply with instructions or day-to-day directions from Navy personnel during patient care activities; instead, it requires the Contractor/PhyAmerica, not the physicians providing treatment, to comply with applicable NH "directives, instructions and notices."

[15]   *See also Leone v. United States*, 910 F.2d 46, 48-51 (2nd Cir. 1990), *cert. denied,* 499 U.S. 905 (1991) (finding that despite government providing its contractor's physicians with detailed guidelines for conducting medical exams, requiring the use of specific equipment and examination techniques, setting forth medical standards physicians were to apply, requiring physicians to act under general supervision of government, the control test was unsatisfied because detailed regulations and evaluations were an insufficient

The Plaintiffs categorize the Government's argument as "form over substance," asserting that the Government went "much further than requiring compliance with Federal Regulations." (Doc. 31) Although the Government prescribed guidelines pertaining to credentialing, patient eligibility, treatment protocols, referral procedures and administrative tasks, this type of administrative control alone does not create a genuine issue of material fact under the applicable law regarding whether the physicians were government employees. "[T]he United States may still fix specific conditions to implement federal objectives and can require compliance with federal standards without transforming contractors into employees." *Cruz*, 70 F. Supp. 2d at 1295. "[T]he real test is control over the *primary activity* contracted for and not the peripheral, administrative acts relating to such activity." *Id.* at 1293 (emphasis added). With regard to Dr. Moore and P.A. Scott, the primary activity contracted for was the rendering of professional medical services in the NH ER, and the Government expressly relinquished any direct control over the rendering of those services.

Upon careful review of the totality of the relationship between the Government, PhyAmerica, Dr. Moore, and P.A. Scott, see *Bravo*, 532 F.3d at 1160, the court concludes that there are no genuine issues of material fact in the record from which a juror could reasonably find that Dr. Moore or P.A. Scott were Government employees. Thus, there is no basis for subject matter jurisdiction under the FTCA on any claim set forth in the complaint, and the Government, therefore, is entitled to judgment as a matter of law.

Accordingly, it is hereby ORDERED:

1. Defendant's Motion for Summary Judgment (doc. 23) is GRANTED.

---

basis to satisfy control test); *Lilly v. Fieldstone*, 876 F.2d 857 (10th Cir. 1989) (finding control test unsatisfied because government did not control emergency room physician's choices anymore than a private hospital would); *Lurch v. United States*, 719 F.2d 333, 338 (10th Cir. 1983), *cert. denied,* 466 U.S. 927 (1984) (finding medical services rendered by physician pursuant to contract between government and a university did not satisfy control test because contract expressly stated "[s]uch [medical] personnel shall not be considered VA employees for any purpose"); *Bernie v. United States*, 712 F.2d 1271 (8th Cir. 1983) (finding control test unsatisfied because government did not dictate physician's medical judgment or treatment); *MacDonald v. United States*, 807 F. Supp. 775, 778-81 (M.D. Ga. 1992) (finding control test unsatisfied for reasons including the contract contained an independent contractor clause); *Spitzer*, 1988 WL 363944, at *2-3 (same); *Cruz v. United States*, 70 F. Supp. 2d 1290, 1295 (S.D. Fla. 1998) (noting that the circuit courts have "consistently held that physicians either in private practice or associated with an organization under contract to provide medical services to facilities operated by the federal government are independent contractors, and not employees of the government for FTCA purposes).

2.  Consistent with this order, the Clerk of Court is directed to enter summary final judgment in favor of Defendant United States of America and against the Plaintiffs in Doc.3:09cv382-MCR/EMT.
3.  The stay previously imposed (doc. 26) is hereby LIFTED.
4.  There is no longer a need for consolidation.  Therefore, the member case will now proceed under its original number, as Case No. 3:09cv383-MCR/EMT, and the Clerk is directed to file a copy of this order in that case file as well.  Hereafter, the parties to the member suit shall file all documents under Case No. 3:09cv383-MCR/EMT.  The parties to Case No. 3:09cv383-MCR/EMT are directed to confer within fourteen (14) days and file, within seven (7) days after their conference, a Rule 26 status report, advising the court of discovery and scheduling needs.
5.  The Clerk is directed to close Case No. 3:09cv382-MCR/EMT, and tax costs against the Plaintiffs.

**DONE and ORDERED** on this 26th day of August 2011.

*M. Casey Rodgers*
M. Casey Rodgers
CHIEF UNITED STATES DISTRICT JUDGE